JUDGE SULLIVAN    10  cv  4419

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION; AMERICAN CIVIL LIBERTIES UNION FOUNDATION, <br><br> Plaintiffs, <br><br> v. <br><br> OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE; DEPARTMENT OF JUSTICE; NATIONAL SECURITY AGENCY / CENTRAL SECURITY SERVICE; DEPARTMENT OF DEFENSE, <br><br> Defendants. | COMPLAINT FOR INJUNCTIVE RELIEF <br><br> Civil Action No. <br><br> ECF Case |



## COMPLAINT FOR INJUNCTIVE RELIEF

### Preliminary Statement

1.    In this Freedom of Information Act ("FOIA") case, plaintiffs challenge the government's failure to release records about the government's interpretation and implementation of the FISA Amendment Act of 2008 ("FAA"), Pub. L. No. 110-261 (2008), *codified at* 50 U.S.C. § 1881a *et seq.*, a controversial piece of legislation through which Congress granted the executive branch virtually limitless power to collect Americans' international e-mails and telephone calls *en masse*, without a warrant, without suspicion of any kind, and with only very limited judicial oversight.  Although the FAA has been in operation for nearly two years – and has remained the subject of widespread public concern and debate since its enactment – the public is almost entirely in the dark about how broadly the government has interpreted the law; how the surveillance powers granted by the law have been used; whether they have been abused; how many U.S citizens' and residents' communications have been collected; and what

safeguards are in place to prevent abuses. The little that is known about FAA implementation does not inspire public confidence. News reports suggest that the government has used its FAA powers to collect U.S. citizens' and residents' international communications by the millions and has used the FAA improperly to collect purely domestic communications as well.

2.      The FAA requires the Attorney General, the Director of National Intelligence, the head of each agency that implements the FAA, as well as the Inspector Generals of those agencies, to produce periodic reports that assess, among other things, the interception, analysis, and dissemination of U.S. citizens' and residents' communications under the law; the sufficiency of and compliance with safeguards to protect U.S. citizens' and residents' privacy rights; and whether the sweeping FAA powers are necessary or effective. However, none of these reports, nor any portion of them, have been made public.

3.      Nearly six months have elapsed since the American Civil Liberties Union and the American Civil Liberties Union Foundation (collectively "ACLU") filed FOIA requests (the "Requests") seeking records regarding the interpretation and implementation of the FAA from defendants Office of the Director of National Intelligence ("ODNI"), Department of Justice ("DOJ"), National Security Agency ("NSA"), and the Department of Defense ("DOD"). None of the agencies, however, has released any responsive records.

4.      The records plaintiffs seek are urgently needed to fill an informational void about a topic of widespread public concern and to inform the ongoing national and congressional debate about the government's electronic surveillance powers. The FAA is not a permanent law; it is set to expire at the end of 2012. Congress intentionally made this controversial law temporary so that it – and the public – could evaluate whether the radical changes the FAA wrought to the government's electronic spying regime were wise, necessary, working effectively

in practice, and sufficiently protective of U.S. citizens' and residents' privacy rights.  During the course of the next year and a half, Congress must debate and resolve whether the FAA should expire, be amended, or be extended.  Release of the records sought here is essential for the public meaningfully to participate in – or even understand – that debate.  Plaintiffs are entitled to expedited processing of their Requests and the prompt release of responsive records; to a waiver of processing fees because the release of the requested records is in the "public interest"; and to a limitation of processing fees because the ACLU is a "news media" requestor.

5.    Plaintiffs seek an injunction requiring defendant agencies immediately to process plaintiffs' Requests and to release responsive records.  Plaintiffs also seek an order enjoining defendants from assessing fees for the processing of the Requests.

## Jurisdiction and Venue

6.    This Court has subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 5 U.S.C. § 552(a)(4)(B) and 5 U.S.C. § 552(a)(4)(A)(vii).  This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. §§701-706.  Venue is proper in this district under 5 U.S.C. § 552(a)(4)(B).

## Parties

7.    Plaintiff American Civil Liberties Union is a nationwide, non-profit, non-partisan 501(c)(4) organization with over 500,000 members dedicated to the constitutional principles of privacy, free speech, liberty, and equality.

8.    Plaintiff the American Civil Liberties Union Foundation ("ACLUF") is a separate 501(c)(3) organization that educates the public about civil liberties and employs lawyers who provide legal representation free of charge in cases involving civil liberties.  Among other things,

3

the ACLUF works to ensure transparency about the government's national security surveillance powers and practices that implicate civil liberties.

9.    Defendant ODNI is a department of the executive branch of the U.S. government. The ODNI is an agency within the meaning of 5 U.S.C. § 552(f)(1).

10.    Defendant DOJ is a department of the executive branch of the U.S. government. The DOJ is an agency within the meaning of 5 U.S.C. § 552(f)(1).

11.    Defendant NSA is a department of the executive branch of the U.S. government. The NSA is an agency within the meaning of 5 U.S.C. § 552(f)(1).

12.    Defendant DOD is a department of the executive branch of the U.S. government. The DOD is an agency within the meaning of 5 U.S.C. § 552(f)(1).

**Factual Background**

The FISA Amendments Act of 2008

13.    In December 2005 *The New York Times* revealed that soon after the September 11 terrorist attacks, former President George W. Bush authorized the NSA to conduct warrantless electronic surveillance of Americans inside the nation's borders even though the Foreign Intelligence Surveillance Act expressly prohibited the practice.  The program operated until January 2007.

14.    On July 10, 2008, former President Bush signed the FAA into law.  This controversial piece of legislation expanded the executive branch's power to conduct warrantless and suspicionless surveillance of Americans' international communications.

15.    The FAA allows the Attorney General and Director of National Intelligence ("DNI") to jointly authorize, for a period up to one year, surveillance targeted at people reasonably believed to be located outside the United States.  While the act prohibits the

4

government from intentionally targeting any person known to be located in the United States at the time communications are acquired, the act permits the Attorney General and DNI to authorize the mass acquisition of communications that originate or terminate inside the United States – i.e. U.S. citizens' and residents' communications with people abroad.

16.    To conduct these electronic acquisitions, the Attorney General and DNI must apply for an acquisition order from the Foreign Intelligence Surveillance Court ("FISC"). The Attorney General and DNI must provide to the FISC a certification attesting, among other things, that: (1) the acquisition is intended to target people reasonably believed to be abroad; (2) a significant purpose of the acquisition is to obtain foreign intelligence information; (3) they have submitted "targeting procedures" reasonably designed to ensure that the acquisition is limited to targeting people reasonably believed to be located outside the United States and to prevent the intentional acquisition of Americans' purely domestic communications; (4) they have submitted programmatic "minimization procedures" reasonably designed to minimize the acquisition and retention, and prohibit the dissemination of, certain information concerning U.S. citizens and residents; and (5) they have has adopted "guidelines" to ensure compliance with targeting and minimization procedures.

17.    After reviewing the government's certification and its targeting and minimization procedures, the FISC may grant, grant with modification, or deny acquisition applications.

18.    The FAA requires the Attorney General and the DNI to conduct a semi-annual assessment of compliance with FAA targeting and minimization procedures and guidelines and to provide those assessments to the FISC and certain congressional committees.

19.    The FAA requires the head of each element of the intelligence community conducting FAA acquisitions to conduct an annual review to determine whether foreign

intelligence information has been or will be obtained from the acquisition. The annual review must provide, among other things, the number of FAA surveillance targets that were later determined to be located in the United States; the number of U.S. citizens and residents whose communications were acquired under the FAA or whose communications or identities were referenced in disseminated in intelligence reports; a description of any procedures (such as minimization procedures) developed by the agency to assess the extent to which FAA acquisitions have collected the communications of U.S. citizens and residents and how the privacy rights of U.S citizens and residents are protected; and the results of any such assessments. These annual reviews must be provided to the FISC, the Attorney General, the DNI, and certain congressional committees.

20.    The FAA authorizes the Inspector General of the Department of Justice, as well as the Inspector Generals of each element of the intelligence community authorized to acquire communications and information under the FAA, to review compliance with FAA targeting and minimization procedures and guidelines. It also authorizes the Inspector Generals to review the number of FAA surveillance targets that were later determined to be located in the United States, and the number of U.S. citizens and residents whose communications were acquired under the FAA or whose communications or identities were referenced in disseminated in intelligence reports. Inspector General reviews are to be provided to the Attorney General, the DNI, and certain congressional committees.

21.    The FAA is a temporary law that will expire at the end of 2012.

Public Concern about the FAA

22.    The FAA – and the virtually limitless electronic surveillance power it gives the government – has been a significant matter of public concern and media interest since before its

passage to the present. *See, e.g.*, Sean Lengell, *House Approves Update of Bipartisan Spy Laws*, Wash. Times, June 21, 2008; Peter Grier, *White House Scores Key Victory on Government Eavesdropping*, Christian Science Monitor, July 10, 2008; Eric Lichtblau, *Senate Approves Bill to Broaden Wiretap Powers*, N.Y. Times, July 10, 2008; Ryan Singel, *Bush Signs Spy Bill, ACLU Sues*, Wired, July 10, 2008; Grant Gross, *ACLU Files Lawsuit to Challenge Surveillance Law*, PC World, July 10, 2008; Antonio Vargas, *Obama Defends Compromise on New FISA Bill*, Wash. Post, July 4, 2008; Eric Lichtblau & James Risen, *Officials Say U.S. Wiretaps Exceeded Law*, N.Y. Times, Apr. 15, 2009; Joby Warrick, *Problems in Wiretapping Bring Change*, Wash. Post, Apr. 16, 2009; Pamela Heiss, *Senate Panel to Probe Wiretapping Violations*, Assoc. Press, Apr. 16, 2009; Glenn Greenwald, *The NYT's Predictable Revelation: New FISA Law Enabled Massive Abuses*, Salon, Apr. 15, 2009; James Risen & Eric Lichtblau, *E-Mail Surveillance Renews Concerns in Congress*, N.Y. Times, June 16, 2009; Marc Ambinder, *Pinwale and the New NSA Revelations*, The Atlantic, June 16, 2009; Kim Zetter, *NSA Secret Database Ensnared President Clinton's Private E-mail*, Wired, June 17, 2009; James Bamford, *The NSA is Still Listening to You*, Salon, July 22, 2009; *NSA to Build Secretive Data Center in Utah*, Assoc. Press, Oct. 23, 2009; Marc Ambinder, *Did Hoekstra Compromise A Sensitive Intelligence Program?*, The Atlantic, Nov. 12, 2009; David Kravets, *Warrantless Wiretapping*, Wired, Jan. 28, 2010; James Bamford, *Big Brother is Listening*, The Atlantic, Mar. 24, 2010; Ellen Nakashima, *Group Challenging Enhanced Surveillance Law Faces Uphill Climb*, Wash. Post, Apr. 19, 2010; Julian Sanchez, *FISA Applications Are Down But is Surveillance?*, Cato Institute, May 11, 2010.

23.    The FAA also has been strongly criticized in many of the nation's leading editorial pages, from before its enactment to the present. *See, e.g.*, Editorial, *Mr. Bush v. the Bill*

*of Rights*, N.Y. Times, June 18, 2008; Editorial, *Compromising the Constitution*, N.Y. Times, July 8, 2008; Editorial, *Election-Year Spying Deal is Flawed, Overly Broad*, USA Today, June 25, 2008; Editorial, *FISA Follies*, Wash. Post, July 3, 2008; Editorial, *The Day of the New Surveillance Law*, N.Y. Times, July 11, 2008; Editorial, *The Eavesdropping Continues*, N.Y. Times, June 18, 2009; Editorial, *When it Comes to Terror, We Can't Tell You*, N.Y. Times, Apr. 3, 2010; Editorial, *Spying, Civil Liberties, and the Courts*, N.Y. Times, Apr. 16, 2010.

24.    Although the FAA does not expire until 2012, a number of bills already have been introduced in Congress to alter or amend the FAA.

25.    Despite this widespread concern, however, there is almost no publicly available information about the government's interpretation or implementation of its expanded surveillance powers under the FAA. The government has not disclosed, for example, how it has interpreted the scope of its FAA power; how it is using its FAA power; the extent to which it has used the FAA to engage in dragnet collection and analysis of e-mail, text, and voice traffic; whether it is abusing its FAA power; whether the abuses reported by the media continue; the scope of the privacy impact FAA surveillance has had, in practice, on U.S. citizens and residents; whether the minimal checks imposed on the government's FAA spying power have proved inadequate; or the results of any of the reports and assessments required by the FAA.

26.    The scarcity of publicly-available information about the FAA in operation has hindered an informed public debate on the subject. This problem will only grow more acute once Congress begins debating whether the FAA should be repealed, amended, or extended in advance of the Act's sunset in 2012.

## The FOIA Requests

### The Requested Records

27.    On November 18, 2009, the ACLU filed FOIA requests with defendants ODNI, DOJ, NSA, and DOD seeking the release of records pertaining to the interpretation and implementation of the FAA.  A copy of the Request is attached hereto as Exhibit A.

28.    The Requests sought seven categories of records created since July 10, 2008 pertaining to:

- The number of FAA acquisition applications submitted to the FISC, as well as the number of acquisition applications the FISC has granted, granted with modification, or rejected.

- The number of U.S. citizens and residents whose communications have been collected, intercepted, targeted, disseminated, or referenced in intelligence reports pursuant to FAA acquisition orders, as well as the number of FAA surveillance targets later determined be located within the United States.

- The collection, analysis, or dissemination of purely domestic communications pursuant to FAA acquisition orders.

- Legal memoranda (including Office of Legal Counsel memoranda), procedures, policies, directives, practices, guidance, or guidelines about FAA surveillance; the scope of authority granted by the FAA; implementation of the FAA; targeting and minimization procedures adopted pursuant to the FAA; and the interception, collection, analysis, or dissemination of U.S. citizens' or residents' communications pursuant to the FAA.

- Inter- or intra-agency correspondence about the scope of authority granted by the FAA; legal interpretations of the FAA; or rules governing the interception, collection, analysis, or dissemination of U.S. citizens' and residents' communications.

- Reports, assessments, or reviews issued or conducted by the Attorney General, DNI, agency heads, or Inspector Generals pursuant to, or mandated by, the FAA.

- Complaints about, investigations of, or disciplinary actions related to surveillance conducted pursuant to the FAA.

Request for Expedited Processing

29.     Plaintiffs sought expedited processing of the Requests on the grounds that the records are "urgently needed" by an organization "primarily engaged in disseminating information" in order "to inform the public about actual or alleged Federal government activity." Plaintiffs also sought expedited processing on the grounds that the records sought relate to "a matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence," and to a "breaking news story of general public interest."

30.     In the Requests, plaintiffs explained that the records sought were urgently needed to inform the public about the government's interpretation and implementation of a controversial federal statute that seriously impacts American's privacy and free speech rights, and to inform the ongoing public and congressional debate about whether the government's FAA-derived electronic surveillance powers should be narrowed, amended, or subject to greater oversight. Plaintiffs also explained that the ACLU is "primarily engaged in disseminating information" to the public under the FOIA because obtaining information about government activity, analyzing that information, and widely publishing and disseminating that information to the press and public is a critical and substantial component of the ACLU's work and one of its primary activities.  Plaintiffs described the ACLU's regular means of distributing and publicizing information, such as information obtained through FOIA requests, which include: a paper newsletter distributed to approximately 450,000 people; a bi-weekly electronic newsletter distributed to approximately 300,000 subscribers; published reports, books, pamphlets, and fact sheets; a widely-read blog; a heavily-visited website, including searchable databases of

10

documents obtained through FOIA requests and documents interpreting and commenting on

FOIA documents; and a television series on civil liberties issues.

Request for a Public Interest Fee Waiver

31.    Plaintiffs sought a waiver of processing fees on the ground that disclosure of the

requested records is in the "public interest" because it is "likely to contribute significantly to the

public understanding of the operations or activities of the government."

32.    In the Requests, plaintiffs explained that disclosure of the requested records

would contribute significantly to the public's understanding of the government's interpretation

and implementation of its electronic surveillance powers under the FAA, including the impact

the FAA has had on the privacy and speech rights of U.S. citizens and residents.  The Requests

also stated that the ACLU did not seek disclosure in order to further any commercial interest

because the ACLU summarizes, explains, and disseminates information it gathers through the

FOIA at no cost to the public.

Request for a Limitation of Processing Fees Based on News Media Requestor Status

33.    Plaintiffs sought a limitation of processing fees on the ground that the ACLU

qualifies as a "news media" requestor.

34.    The Requests explained that the ACLU is a news media requestor for the

purposes of the FOIA because it is an entity that gathers information of potential interest to a

segment of the public, uses its editorial skills to turn raw materials into a distinct work, and

distributes that work to an audience. The Requests described the ACLU's publishing activities,

which include the publication of electronic and paper newsletters, news briefs, reports, books,

fact sheets, pamphlets, and other educational and informational materials, as well as the

maintenance of an extensive website and a heavily trafficked blog.

11

**Agency Responses**

35.     None of the defendants has disclosed any records responsive to the Requests.

Office of the Director of National Intelligence

36.     By letter dated December 15, 2009, the ODNI denied plaintiffs' request for expedited processing on the grounds that the request did not meet the agency's definition of "compelling need," which exists where the "matter involves an imminent threat to the life or physical safety of an individual" or when "a person primarily engaged in disseminating information makes the request and the request is relevant to a subject of public urgency concerning actual or alleged Federal government activity." Beyond this, the ODNI did not explain the basis for the denial.

37.     By letter dated December 17, 2009 plaintiffs timely appealed the ODNI's denial of their request for expedited processing.

38.     By letter dated February 4, 2010, the ODNI rejected plaintiffs' appeal, upholding its determination to deny expedited processing.

39.     The ODNI has not made a determination regarding plaintiffs' request for a waiver or limitation of processing fees.

Department of Justice

40.     By letter dated November 23, 2009, the DOJ Office of the Inspector General ("DOJ OIG") acknowledged receipt of the Requests.

41.     By letter dated November 30, 2009, the DOJ referred the Requests to DOJ components Office of Legal Counsel ("OLC"), National Security Division ("NSD"), the Federal Bureau of Investigations ("FBI"), and the Federal Bureau of Prisons ("BOP"). Plaintiffs believe that DOJ mistakenly referred the Requests to the BOP rather than the FBI. DOJ's November 30,

2009, letter stated that the Requests had been referred to the FBI and the NSD. The "Referral/Action Slip" that accompanied that letter, however, indicated that the Requests had been referred to the OLC, NSD, and BOP. The BOP granted plaintiffs' request for expedited processing, promptly conducted a search, and informed plaintiffs that it had no responsive records.

42.     By letter dated January 6, 2010, the DOJ OIG stated that it had processed plaintiffs' Requests and had located responsive records. It found, however, that the responsive records "originated with other components listed in [the] FOIA request." Because "those components [were] processing [the] request and [were] already in receipt of such documents" the DOJ OIG would "not be making a referral to those components." The letter also advised that "no other documents were located in the OIG."

43.     By letter dated January 11, 2009, the DOJ re-referred the Requests to the FBI. This letter was misdated. Plaintiffs received the letter in January 2010.

44.     Plaintiffs have never received any further response or records from DOJ components OLC, NSD, or FBI.

<u>National Security Agency</u>

45.     By letter dated November 24, 2009, the NSA denied plaintiffs' request for expedited processing on the grounds that plaintiffs were not "primarily engaged in disseminating information" because this was not the ACLU's "primary" activity; the requested records did not relate to a "breaking news story" because the topic already had received "widespread coverage and attention"; and the information would not "lose its value if not processed on an expedited basis." The letter acknowledged that the NSA had "approved expedited processing for a previous request [the ACLU] had submitted," but stated that it had granted expedited processing

"based solely on the urgency of the information sought" and had "failed to first address whether the ACLU was organized primarily to disseminate news."

46.    By letter dated December 17, 2009 plaintiffs timely appealed the NSA's denial of their request for expedited processing.

47.    By letter dated January 15, 2010, the NSA rejected plaintiffs' appeal, upholding its determination to deny expedited processing.

48.    The NSA has not made a determination regarding plaintiffs' request for a waiver or limitation of processing fees.

Department of Defense

49.    By letter dated November 24, 2009, the DOD Office of Inspector General ("DOD OIG") denied plaintiffs' request for expedited processing on the grounds that the ACLU does not "publish[] or disseminat[e] information as its primary activity" and because the information sought would not "lose its value if not processed on an expedited basis." The letter also stated that the DOD OIG would not make a determination on plaintiffs' request for a public interest fee waiver until the search for records had been completed but that the DOD OIG was rejecting plaintiffs' request for "news media" fee status, placing plaintiffs in the "other" fee category. The letter provided no explanation as to why the DOD OIG had rejected plaintiffs' news media fee limitation request. The letter also stated that the DOD OIG would not "process [the] request beyond the two hours of [free] search time and 100 pages of records" because plaintiffs had not "indicated a willingness to pay fees." The letter requested that plaintiffs submit a "written commitment as to the amount of fees that [they] are willing to pay in order to process this request beyond the two hours of search time and 100 pages of records."

50.    By letter dated December 4, 2009, plaintiffs addressed the DOD OIG's deferral of

14

their "public interest" fee waiver request. In the letter, plaintiffs objected to the DOD OIG's "practice of evaluating fee waiver requests only after a search and assessment of the 'volume and nature' of the responsive records," and to the DOD OIG's practice of "requiring a written commitment to pay fees prior to determining whether to grant a request for fee waiver."

51.    By letter dated December 17, 2009, plaintiffs timely appealed the DOD OIG's denial of their requests for expedited processing and for a news media processing fee limitation.

52.    The statutory deadline for deciding appeals has passed but the DOD OIG has not issued a determination on plaintiffs' appeal.

## Causes of Action

53.    Defendants' failure to timely respond to the Requests violates the FOIA, 5 U.S.C. § 552(a)(6)(A), and defendants' corresponding regulations.

54.    Defendants' failure to make promptly available the records sought by the Requests violates the FOIA, 5 U.S.C. § 552(a)(3)(A), and defendants' corresponding regulations.

55.    Defendants' failure to expedite processing of the Requests violates the FOIA, 5 U.S.C. § 552(a)(6)(E), and defendants' corresponding regulations.

56.    Defendants' failure to make a reasonable effort to search for records responsive to the Requests violates the FOIA, 5 U.S.C. § 552(a)(3)(C), and defendants' corresponding regulations..

57.    Defendant DOD's failure to grant plaintiffs' request for a limitation of fees violates the FOIA, 5 U.S.C. § 552(a)(4)(A)(ii)(II), and defendants' corresponding regulations.

## Requested Relief

WHEREFORE, plaintiffs respectfully request that this Court:

1. Order defendants immediately to process all requested records;

15

2. Order defendants to conduct a thorough search for all responsive records;

3. Order defendants promptly to disclose the requested records in their entirety, and make copies available to plaintiffs;

4. Enjoin defendants from charging plaintiffs fees for the processing of their Requests;

5. Award plaintiffs costs and reasonable attorneys' fees incurred in this action; and

6. Grant such other relief as the Court may deem just and proper.

Respectfully submitted,

MELISSA GOODMAN (MG-7844)
JAMEEL JAFFER (JJ-4653)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, New York 10004
Phone: 212-549-2500
Fax: 212-549-2654

CHRISTOPHER DUNN (CD-3991)
ARTHUR EISENBERG (AE-2012)
New York Civil Liberties Union
125 Broad Street, 19th Floor
New York, New York 10004

June 3, 2010

16

# Exhibit A



November 18, 2009

FOIA/PA Mail Referral Unit
Department of Justice
Room 115
LOC Building
Washington, D.C. 20530-0001

Office of the Inspector General
Department of Justice
950 Pennsylvania Avenue, N.W., Room 4726
Washington, D.C. 20530-0001

Office of Legal Counsel
Room 5515, 950 Pennsylvania Avenue, NW
Department of Justice
Washington, DC 20530-0001
(202) 514-2038

Office of the Director of National Intelligence (ODNI)
Washington, D.C. 20511

Office of the Director of National Intelligence (ODNI)
Attn: Office of the Inspector General
Washington, D.C. 20511

National Security Agency
Attn: FOIA/PA Office (DC34)
9800 Savage Road, Suite 6248
Ft. Mead, MD 20755-6248

FOIA Requester Service Center
Department of Defense
Office of the Inspector General
400 Army Navy Drive, Suite 1021
Arlington, VA 22202-4704

**AMERICAN CIVIL LIBERTIES
UNION FOUNDATION**
NATIONAL OFFICE
125 BROAD STREET, 18TH FL.
NEW YORK, NY 10004-2400
T/212.549.2500
WWW.ACLU.ORG

**OFFICERS AND DIRECTORS**
SUSAN N. HERMAN
*PRESIDENT*

ANTHONY D. ROMERO
*EXECUTIVE DIRECTOR*

RICHARD ZACKS
*TREASURER*

Re:    **Request Under Freedom of Information Act/Expedited Processing
Requested**

To Whom It May Concern:

This letter constitutes a request ("Request") by the American Civil
Liberties Union and the American Civil Liberties Foundation (collectively

"ACLU") under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, the Department of Justice implementing regulations, 28 C.F.R. § 16.1, the Department of Defense implementing regulations, 32 C.F.R. § 286.1, and the Office of the Director of National Intelligence implementing regulations, 32 C.F.R. § 1700.1   The Request is submitted by the American Civil Liberties Union Foundation and the American Civil Liberties Union (collectively, the "ACLU").[1]

On July 10, 2008, President Bush signed into law the Foreign Intelligence Surveillance Act Amendments Act of 2008 ("FISA Amendments Act" or "FAA").   This controversial piece of legislation not only effectively legalized the secret warrantless surveillance program that President Bush had authorized in late 2001,[2] it gave the National Security Agency ("NSA") new power to conduct dragnet surveillance of Americans' international telephone calls and e-mails.  The FAA gives the government virtually limitless power to collect Americans' international communications *en masse*, without a warrant, without suspicion of any kind, and with only very limited judicial oversight. The massive electronic surveillance power the FAA places in the hands of executive agencies implicates core privacy and free-speech concerns for all Americans.

The FAA has now been in effect for more than one year.  However, the public remains largely in the dark about how the government has interpreted and actually implemented its sweeping spying power under the FAA.

Furthermore, the scant information that has surfaced regarding implementation of the FAA is troubling.  News reports suggest that the government has interpreted the FAA authority broadly to permit mass collection of U.S. communications, and that the NSA has systematically abused its (already broad) FAA power. *See* Eric Lichtblau & James Risen, *Officials Say U.S. Wiretaps Exceeded Law*, N.Y. Times, Apr. 15, 2009

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

---

[1] The American Civil Liberties Union Foundation is a 26 U.S.C. § 501(c)(3) organization that provides legal representation free of charge to individuals and organizations in civil rights and civil liberties cases, and educates the public about the civil liberties implications of pending and proposed legislation, provides analyses of pending and proposed legislation, directly lobbies legislators, and mobilizes its members to lobby their legislators.  The American Civil Liberties Union is a separate non-profit, 26 U.S.C. § 501(c)(4) membership organization that educates the public about the civil liberties implications of pending and proposed state and federal legislation, provides analysis of pending and proposed legislation, directly lobbies legislators, and mobilizes its members to lobby their legislators.

[2] Media reports in 2005 first revealed that soon after the September 11 terrorist attacks, President Bush authorized the NSA to conduct warrantless electronic surveillance of Americans inside the nation's borders even though the Foreign Intelligence Surveillance Act expressly prohibited the practice. *See, e.g.*, James Risen and Eric Lichtblau, *Bush Let U.S. Spy on Callers Without Courts*, N.Y. Times, Dec. 16, 2005

(stating that the NSA's "overcollection" of American' communications has been "significant and systemic"); James Risen & Eric Lichtblau, *E-Mail Surveillance Renews Concerns in Congress*, N.Y. Times, June 16, 2009 (highlighting the NSA's over-collection of Americans' personal e-mails). This Request seeks records that will illuminate how agencies responsible for implementing the FAA are interpreting this invasive electronic surveillance power; how the FAA spying power is being used; and what safeguards are in place to prevent abuse of Americans' privacy rights.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

## **Requested Records**

1.  Any and all records created since July 10, 2008 indicating the number of:

    A.  Acquisition applications submitted to the Foreign Intelligence Surveillance Court ("FISC") pursuant to Section 702 of the FISA Amendments Act of 2008, Pub. L. No. 110-261 (2008).[3]
    B.  Acquisition orders the FISC has issued pursuant to Section 702 of the FAA.
    C.  Acquisition orders the FISC has granted with modifications.
    D.  Acquisition applications the FISC has granted without modifications.
    E.  Acquisition applications the FISC has rejected.

2.  Any and all records created since July 10, 2008 indicating the number of:

    A.  U.S. persons[4] whose communications have been collected or intercepted pursuant to Section 702 of the FAA.
    B.  U.S. persons who have been targeted by surveillance conducted pursuant to Section 702 of the FAA.
    C.  Targets of surveillance conducted pursuant to Section 702 of the FAA who were later determined to be located in the United States.
    D.  U.S. persons who have been identified in disseminated intelligence reports resulting from or related to surveillance conducted pursuant to Section 702 of the FAA.
    E.  Disseminated intelligence reports resulting from or related to surveillance conducted pursuant to Section 702 of the FAA that contain a reference to a U.S. person's identity.

---

[3] The term "acquisition applications" means requests made by the Attorney General and/or the Director of National Intelligence for FISC approval of surveillance "targeting . . . persons reasonably believed to be located outside the United States to acquire foreign intelligence information" under authority granted by Section 702 of the FAA. Requesters to do not seek any records pertaining to acquisitions or surveillance conducted pursuant to other sections of the FAA or the Foreign Intelligence Surveillance Act more generally.

[4] The term U.S. person means any U.S. citizen or legal permanent resident.

3

3. Any and all records created since July 10, 2008 pertaining to the collection, analysis, or dissemination of purely domestic communications pursuant to Section 702 of the FAA.[5]

4. Any and all legal memoranda (including Office of Legal Counsel memoranda), procedures, policies, directives, practices, guidance, or guidelines created since July 10, 2008 pertaining to:

   A. Surveillance conducted under Section 702 of the FAA.
   B. The scope of authority granted by Section 702 of the FAA.
   C. The implementation of Section 702 of the FAA.
   D. Targeting and minimization procedures adopted pursuant to Section 702 of the FAA.
   E. Interception, collection, analysis, dissemination, or analysis of U.S. persons' communications pursuant to Section 702 of the FAA (whether or not a U.S. person is the target of the interception).

5. Any and all inter or intra-agency correspondence pertaining to the scope of authority granted by Section 702 of the FAA, legal interpretations of any part of Section 702 of the FAA, or rules governing the interception, collection, analysis, or dissemination of U.S. communications.

6. Any and all reports, assessments, or reviews issued or conducted pursuant to Section 702(l) of the FAA since July 10, 2008, including any by the Attorney General, Director of National Intelligence, the head of another intelligence agency, the Inspector General of the Department of Justice, or the Inspector General of any other intelligence agency.

7. Any and all records created since July 10, 2008 concerning complaints about, investigations of, or disciplinary actions related to surveillance conducted pursuant to Section 702 of the FAA.

### I. Application for Expedited Processing

We request expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E); 28 C.F.R. § 16.5(d); 32 C.F.R. § 286.4(d)(3); and 32 C.F.R. § 1700.12. There is a "compelling need" for these records because the information requested is urgently needed by an organization primarily engaged in disseminating information in order to inform the public about actual or alleged Federal government activity. 5 U.S.C. § 552(a)(6)(E)(v); *see also* 28 C.F.R. § 16.5(d)(1)(ii); 32 C.F.R. § 286.4(d)(3)(ii); 32 C.F.R. § 1700.12(c)(2). In addition, the records sought relate to a "matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence," 28 C.F.R. § 16.5(d)(1)(iv), as well

---

[5] The term "purely domestic communication" means a communication where both parties to the communication are located in the United States.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

as a "breaking news story of general public interest," 32 C.F.R.
§ 286.4(d)(3)(ii)(A).

The ACLU is "primarily engaged in disseminating information" within
the meaning of the statute and regulations. 5 U.S.C. § 552(a)(6)(E)(v)(II); 28
C.F.R. § 16.5(d)(1)(ii); 32 C.F.R. § 286.4(d)(3)(ii); 32 C.F.R. § 1700.2(h)(4).
Obtaining information about government activity, analyzing that information,
and widely publishing and disseminating that information to the press and
public is a critical and substantial component of the ACLU's work and one of
its primary activities. *See ACLU v. Dep't of Justice*, 321 F. Supp. 2d 24, 30
n.5 (D.D.C. 2004) (finding non-profit public interest group that "gathers
information of potential interest to a segment of the public, uses its editorial
skills to turn the raw material into a distinct work, and distributes that work to
an audience" to be "primarily engaged in disseminating information" (internal
citation omitted)).

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

The ACLU regularly publishes a newsletter at least twice a year that
reports on and analyzes civil liberties-related current events. The newsletter is
widely disseminated to approximately 450,000 people. The ACLU also
publishes a bi-weekly electronic newsletter, which is distributed to subscribers
(both ACLU members and non-members) by e-mail. The electronic
newsletter is widely disseminated to approximately 300,000 people. Both of
these newsletters often include descriptions and analysis of information
obtained through FOIA.

The ACLU regularly publishes reports about government activity and
civil liberties issues based on its analysis of information derived from various
sources, including information obtained from the government through FOIA.
This material is broadly circulated to the public and widely available to
everyone for no cost or, sometimes, for a small fee. Since 2007 alone, ACLU
national projects have published and disseminated over 30 reports. Many
ACLU reports include description and analysis of government documents
obtained through FOIA.[6] The ACLU also regularly publishes books, "know
your rights" publications, fact sheets, and educational brochures and
pamphlets designed to educate the public about civil liberties issues and
government policies that implicate civil rights and liberties.[7]

---

[6] *See, e.g., Reclaiming Patriotism*, (March 2009), available at
http://www.aclu.org/pdfs/safefree/patriot_report_20090310.pdf; *The Excluded: Ideological
Exclusion and the War on Ideas* (Oct. 2007), available at
http://www.aclu.org/safefree/the_excluded_report.pdf; *History Repeated: The Dangers
of Domestic Spying by Federal Law Enforcement* (May 2007), available at
http://www.aclu.org/images/asset_upload_file893_29902.pdf; *No Real Threat: The
Pentagon's Secret Database on Peaceful Protest* (Jan. 2007), available at
http://www.aclu.org/pdfs/safefree/spyfiles_norealthreat_20070117.pdf; *Unpatriotic Acts: The
FBI's Power to Rifle Through Your Records and Personal Belongings Without Telling You*
(July 2003), available at http://www.aclu.org/FilesPDFs/spies_report.pdf.

[7] A recent search of Amazon.com produced over 60 books published by the ACLU.

The ACLU operates a widely-read blog where original editorial content reporting on and analyzing civil rights and civil liberties news is posted daily. *See* http://blog.aclu.org/. The ACLU also creates and disseminates original editorial and educational content on civil rights and civil liberties news through multi-media projects, including videos, podcasts, and interactive features. *See* http://www.aclu.org/multimedia/index.html. The ACLU has also produced an in-depth television series on civil liberties called "The Freedom Files." *See* http://aclu.tv/.

The ACLU also publishes, analyzes, and disseminates information through its heavily visited website, www.aclu.org. The website addresses civil rights and civil liberties issues in depth, provides features on civil rights and civil liberties issues in the news, and contains many thousands of documents relating to the issues on which the ACLU is focused. The ACLU's website also serves as a clearinghouse for news about ACLU cases, as well as analysis about case developments, and an archive of case-related documents. Through these pages, the ACLU also provides the public with educational material about the particular civil liberties issue or problem; recent news about the issue; analyses of Congressional or executive branch action on the issue; government documents obtained through FOIA about the issue; and more in-depth analytic and educational multi-media features on the issue.[8]

The ACLU website includes many features on information obtained through the FOIA.[9] For example, the ACLU's "Torture FOIA" webpage, www.aclu.org/torturefoia, contains commentary about the ACLU's FOIA request, press releases, analysis of the FOIA documents, an advanced search engine permitting webpage visitors to search the documents obtained through the FOIA, and advises that the ACLU in collaboration with Columbia

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

---

[8] For example, the ACLU's website about national security letter ("NSL") cases, www.aclu.org/nsl, includes, among other things, an explanation of what NSLs are; information about and document repositories for the ACLU's NSL cases, links to documents obtained through FOIA about various agencies' use of NSLs; NSL news in the courts, Congress, and executive agencies; links to original blog posts commenting on and analyzing NSL-related news; educational web features about the NSL gag power; public education reports about NSLs and the Patriot Act; news about and analysis of the Department of Justice Inspector General's reviews of the FBI's use of NSLs; the ACLU's policy analysis and recommendations for reform of the NSL power; charts with analyzed data about the government's use of NSL; myths and facts documents; and links to information and analysis of related issues.

[9] *See, e.g.*, www.aclu.org/torturefoia; http://www.aclu.org/olcmemos/; http://www.aclu.org/safefree/torture/csrtfoia.html; http://www.aclu.org/natsec/foia/search.html; http://www.aclu.org/safefree/nsaspying/30022res20060207.html; www.aclu.org/patriotfoia; www.aclu.org/spyfiles; http://www.aclu.org/safefree/nationalsecurityletters/32140res20071011.html; www.aclu.org/exclusion.

University Press has published a book about the documents obtained through the FOIA.

The ACLU has also published a number of charts that collect, summarize, and analyze information it has obtained through FOIA. For example, through compilation and analysis of information gathered from various sources – including information obtained from the government through FOIA – the ACLU has created an original chart that provides the public and news media with a comprehensive index of Bush-era Office of Legal Counsel memos relating to interrogation, detention, rendition and surveillance which describes what is publicly known about the memos and their conclusions, who authored them and for whom, and whether the memos remain secret or have been released to the public in whole or in part.[10] Similarly, the ACLU produced a chart of original statistics about the Defense Department's use of National Security Letters based on its own analysis of records obtained through FOIA.[11]

The ACLU plans to analyze, publish, and disseminate to the public the information gathered through this Request. The records requested are not sought for commercial use and the Requesters plan to disseminate the information disclosed as a result of this Request to the public at no cost.

Furthermore, the records sought are urgently needed to inform the public about actual or alleged federal government activity. The records sought pertain to the NSA's (and perhaps other U.S. agencies) virtually unchecked collection of Americans' international communications. The records sought also pertain to the government's interpretation and implementation of a controversial federal statute that seriously impacts American's privacy and free speech rights. The records sought are urgently needed because almost nothing is known about how the government has interpreted the scope of its intrusive FAA surveillance powers, how it has actually used those powers, and how many Americans' have been affected. Moreover, this information is vitally needed to inform the ongoing public and congressional debate about whether the government's electronic surveillance power should be narrowed or surveillance laws should be amended.

The requested records also relate to a "matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence," 28 C.F.R. § 16.5(d)(1)(iv), and to a "breaking news story of general public interest that concerns actual or alleged Federal government activity." *See* 32 C.F.R. § 286.4(d)(3)(ii)(A); 28 C.F.R. § 16.5(d)(1)(ii).

---

[10] The chart is available at http://www.aclu.org/safefree/general/olcmemos_chart.pdf.

[11] The chart is available at
http://www.aclu.org/safefree/nationalsecurityletters/released/nsl_stats.pdf.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

7

The government's intrusive electronic surveillance power has been a significant matter of public concern (and media interest) for many years, particularly after the revelation of the NSA's warrantless wiretapping program. The legislation that emerged out of that controversy – the FAA – has been the subject of widespread interest and debate since the moment it was introduced. Indeed, in the weeks leading up to its enactment, the law was the subject of particularly intense coverage. *See, e.g.*, Sean Lengell, *House Approves Update of Bipartisan Spy Laws*, Wash. Times, June 21, 2008; Editorial, *Mr. Bush v. the Bill of Rights*, N.Y. Times, June 18, 2008 (stating that "all indications are" that many of the FAA's provisions are "both unnecessary and a threat to the Bill of Rights"). The law was also strongly criticized in many of the nation's leading editorial pages. *See, e.g.,* Editorial, *Compromising the Constitution*, N.Y. Times, July 8, 2008 (stating that the FAA would "make it easier to spy on Americans at home, reduce the courts' powers and grant immunity to the companies that turned over Americans' private communications without warrant"); Editorial, *Election-Year Spying Deal is Flawed, Overly Broad*, USA Today, June 25, 2008.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

The eventual passage and enactment of the FAA garnered similarly widespread coverage and attention. *See* Peter Grier, *White House Scores Key Victory on Government Eavesdropping*, Christian Science Monitor, July 10, 2008; Eric Lichtblau, *Senate Approves Bill to Broaden Wiretap Powers*, N.Y. Times, July 10, 2008; Shailagh Murray, *Obama Joins Fellow Senators in Passing New Wiretapping Measure*, Wash. Post, July 10, 2008; Antonio Vargas, *Obama Defends Compromise on New FISA Bill*, Wash. Post, July 4, 2008. Major editorial pages continued to weigh in on the law. *See, e.g.,* Editorial, *The Day of the New Surveillance Law*, N.Y. Times, July 11, 2008; Editorial, *FISA Follies*, Wash. Post, July 3, 2008. The immediate filing of a constitutional challenge to the law was the subject of widespread media interest as well. *See* Ryan Singel, *Bush Signs Spy Bill, ACLU Sues*, Wired, July 10, 2008; Grant Gross, *ACLU Files Lawsuit to Challenge Surveillance Law*, PC World, July 10, 2008.

Media attention to the FAA surged, once again, in April 2009 when *The New York Times* reported that the NSA was using its FAA powers to vacuum up U.S. communications by the millions, that it was potentially abusing its sweeping FAA power, and that it was possibly "overcollecting" purely domestic communications in a systematic manner. *See* Eric Lichtblau & James Risen, *Officials Say U.S. Wiretaps Exceeded Law*, N.Y. Times, Apr. 15, 2009; *see also* Joby Warrick, *Problems in Wiretapping Bring* Change, Wash. Post, Apr. 16, 2009; Pamela Heiss, *Senate Panel to Probe Wiretapping Violations*, Assoc. Press, Apr. 16, 2009; Glenn Greenwald, *The NYT's Predictable Revelation: New FISA Law Enabled Massive Abuses*, Salon, Apr. 15, 2009.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Early this summer, similar reports that the NSA was "over-collecting" Americans' personal e-mails again drew significant media attention. *See* James Risen & Eric Lichtblau, *E-Mail Surveillance Renews Concerns in Congress*, N.Y. Times, June 16, 2009; *see also* Editorial, *The Eavesdropping Continues*, N.Y. Times, June 18, 2009; Kim Zetter, *NSA Secret Database Ensnared President Clinton's Private E-mail*, Wired, June 17, 2009; Marc Ambinder, *Pinwale and the New NSA Revelations*, The Atlantic Online, June 16, 2009.

In the past month, there has been a resurgence of public interest, speculation, and concern about the FAA and the NSA's massive surveillance capabilities. It was sparked by revelation of the construction of a 1 million-square-foot data warehouse designed to house intercepted communications and potentially serve as a clearinghouse for both domestic and international monitoring. *See* Alfred M. McCoy, *Surveillance State, U.S.A.*, CBS News, Nov. 12, 2009 (op-ed); Connor Boyack, *Do We Really Want an NSA Data Center in Utah*, The Salt Lake Tribune, Nov. 5, 2009; *NSA Confirms Plans for Utah Data Center*, UPI, Oct. 24, 2009; *NSA to Build Secretive Data Center in Utah*, Assoc. Press, Oct. 23, 2009; James Bamford, *The NSA is Still Listening to You*, Salon, July 22, 2009. Many of these stories highlighted how little is known about the government's surveillance of Americans' communications and personal records, particularly under the FAA. Recent public comments by Representative Hoekstra about electronic surveillance of the Ft. Hood shooting suspect has also sparked renewed speculation about FAA surveillance powers. *See, e.g.*, Marc Ambinder, *Did Hoekstra Compromise A Sensitive Intelligence Program?*, The Atlantic Online, Nov. 12, 2009 (speculating about dragnet surveillance by the NSA).

Moreover, electronic surveillance – and questions about the scope (and wisdom) of many recent pieces of surveillance legislation – remain hotly debated in Congress. In the past two months, discussions over the fate of certain surveillance-related provisions of the USA Patriot Act that are set to expire at the end of this year have attracted significant attention from the media. *See* Daphne Eviatar, *Patriot Act Amendments Disappoint Civil Libertarians*, Wash. Ind., Oct. 1, 2009; Editorial, *Reining in the Patriot Act*, Phila. Inquirer, Sept. 21, 2009; Charlie Savage, *Battle Looms Over the Patriot Act*, N.Y. Times, Sept. 20, 2009; Carrie Johnson and Ellen Nakashima, *White House Seeks Renewal of Surveillance Laws*, Wash. Post, Sept. 16, 2009.

The Patriot Act debate has included some debate about electronic surveillance as well. In fact, a handful of Patriot Act reauthorization bills and amendments have sought to narrow or alter the FISA Amendment Act of 2008. *See, e.g.*, Daphne Eviatar, *Bill Introduced to Repeal Telecom Immunity*, Wash. Ind., Sept. 29, 2009; Grant Gross, *Senators Want to End Telecom Immunity for Spying* Program, PC World, Sept. 29, 2009; David Kravets,

*Telco Spy Immunity Up for Grabs*, Wired, Sept. 24, 2009; Wendy Kaminer, *The Justice Act*, Atlantic, Sept. 18, 2009.

As the sustained media interest concerning the scope and privacy implications of the government's electronic surveillance power clearly attests, the implementation (and potential abuse) of the FAA, constitutes a "matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence," 28 C.F.R. § 16.5(d)(1)(iv). Moreover, the recent attention to and speculation about the scope of the NSA's monitoring power and its data analysis and storage capabilities constitutes a "breaking news story of general public interest." 32 C.F.R. § 286.4(d)(3)(ii)(A).

Accordingly, expedited processing is appropriate in this case.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

## Application for Waiver or Limitation of Fees

We request a waiver of document search, review, and duplication fees on the grounds that disclosure of the requested records is in the public interest and because disclosure is "likely to contribute significantly to the public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." *See* 5 U.S.C. § 552(a)(4)(A)(iii); 32 C.F.R. § 286.28(d); 28 C.F.R. § 16.11(k); 32 C.F.R. § 1700.6(b).

As discussed above, numerous news accounts reflect the considerable public interest in the records we seek. Given the ongoing and widespread media attention to this issue, the records sought in the instant Request will significantly contribute to public understanding of the operations and activities of the NSA and other agencies that are responsible for implementing the FAA. *See* 32 C.F.R. § 286.28(d); 28 C.F.R. § 16.11(k)(1)(i); 32 C.F.R. § 1700.6(b)(2). Given that very little is known about how the government has interpreted and implemented its FAA power in practice, the records sought are certain to contribute significantly to the public's understanding of the issue. In addition, disclosure is not in the ACLU's commercial interest. As described above, any information disclosed by the ACLU as a result of this FOIA request will be available to the public at no cost. Thus, a fee waiver would fulfill Congress's legislative intent in amending FOIA. *See Judicial Watch Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003) ("Congress amended FOIA to ensure that it be 'liberally construed in favor of waivers for noncommercial requesters.'") (citation omitted).

We also request a waiver of document reproduction fees on the grounds that the ACLU qualifies as a "representative of the news media" and the records are not sought for commercial use. 32 C.F.R. § 286.28(e)(7); 28 C.F.R. § 16.11(d); 32 C.F.R. § 1700.6(i)(2). The ACLU meets the statutory

and regulatory definitions of a "representative of the news media" because it is an "entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience." 5 U.S.C. § 552(a)(4)(A)(ii); *see also Nat'l Security Archive v. Dep't of Defense*, 880 F.2d 1381, 1387 (D.C. Cir. 1989); *cf. ACLU v. Dep't of Justice*, 321 F. Supp. 2d 24, 30 n.5 (D.D.C. 2004) (finding non-profit public interest group to be "primarily engaged in disseminating information"). The ACLU is therefore a "representative of the news media" for the same reasons it is "primarily engaged in the dissemination of information." [12]

Notably, courts have found other organizations whose mission, function, publishing, and public education activities are similar in kind to the ACLU's to be "representatives of the news media." *See, e.g., Elec. Privacy Info. Ctr. v. Dep't of Defense*, 241 F. Supp. 2d 5, 10-15 (D.D.C. 2003) (finding non-profit public interest group that disseminated an electronic newsletter and published books was a "representative of the media" for purposes of FOIA); *Nat'l Security Archive*, 880 F.2d at 1387; *Judicial Watch, Inc. v. Dep't of Justice*, 133 F. Supp. 2d 52, 53-54 (D.D.C. 2000) (finding Judicial Watch, self-described as a "public interest law firm," a news media requester). [13]

AMERICAN CIVIL LIBERTIES UNION FOUNDATION

---

[12] On account of these factors, fees associated with responding to FOIA requests are regularly waived for the ACLU. For example, in March 2009, the Department of State granted a fee waiver to the ACLU with respect to its request for documents relating to the detention, interrogation, treatment, or prosecution of suspected terrorists. Likewise, in December 2008, the Department of Justice granted the ACLU a fee waiver with respect to the same request. In May 2005, the United States Department of Commerce granted a fee waiver to the ACLU with respect to its request for information regarding the radio frequency identification chips in United States passports. In March 2005, the Department of State granted a fee waiver to the ACLU with respect to a request regarding the use of immigration laws to exclude prominent non-citizen scholars and intellectuals from the country because of their political views. Also, the Department of Health and Human Services granted a fee waiver to the ACLU with regard to a FOIA request submitted in August of 2004. In addition, the Office of Science and Technology Policy in the Executive Office of the President said it would waive the fees associated with a FOIA request submitted by the ACLU in August 2003. Finally, three separate agencies – the Federal Bureau of Investigation, the Office of Intelligence Policy and Review, and the Office of Information and Privacy in the Department of Justice – did not charge the ACLU fees associated with a FOIA request submitted by the ACLU in August 2002.

[13] Courts have founds these organizations to be "representatives of the news media" even though they engage in litigation and lobbying activities beyond their dissemination of information/public education activities. *See, e.g., Elec. Privacy Info. Ctr.*, 241 F. Supp. 2d 5; *Nat'l Sec. Archive*, 880 F.2d at 1387; *see also Judicial Watch, Inc.*, 133 F. Supp. 2d at 53-54; *see also Leadership Conference on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246, 260 (D.D.C. 2005) (finding Leadership Conference to be primarily engaged in disseminating information even though it engages in substantial amounts of legislative advocacy beyond its publication and public education functions).

*        *        *

Pursuant to the applicable regulations and statute, we expect the determination regarding expedited processing within 10 calendar days. *See* 5 U.S.C. § 552(a)(6)(E)(ii)(I); 32 C.F.R. § 286.4(d)(3).

If the Request is denied in whole or in part, we ask that you justify all withholdings by reference to specific exemptions to FOIA. We expect the release of all segregable portions of otherwise exempt material. We reserve the right to appeal a decision to withhold any information or to deny a waiver of fees.

Thank you for your prompt attention to this matter. Please furnish all applicable records to:

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Melissa Goodman
American Civil Liberties Union
125 Broad Street, 18th Floor
New York, NY 10004

I affirm that the information provided supporting the request for expedited processing is true and correct to the best of my knowledge and belief.

Sincerely,

Melissa Goodman
Staff Attorney
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel. 212-549-2622

12