UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

No. 10 Civ. 4419 (RJS)

AMERICAN CIVIL LIBERTIES UNION, *ET AL.*,

Plaintiffs,

VERSUS

OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE, *ET AL.*,

Defendants.

OPINION AND ORDER
November 15, 2011

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/15/11

RICHARD J. SULLIVAN, District Judge:

In this Freedom of Information Act ("FOIA") suit, Plaintiffs American Civil Liberties Union ("ACLU") and American Civil Liberties Union Foundation seek disclosure and expedited processing of records concerning the government's interpretation and implementation of the FISA Amendments Act of 2008 ("FAA"), the statute governing foreign intelligence surveillance. Specifically, Plaintiffs bring this action against the Office of the Director of National Intelligence ("ODNI"), the Department of Justice ("DOJ"), the National Security Agency ("NSA"), and the Department of Defense ("DOD"), seeking disclosure of statistical data, legal memoranda, and other reports and records pertaining to FAA surveillance.

Now before the Court are the parties' cross-motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and Plaintiffs' motion to strike classified declarations submitted by Defendants or, in the alternative, for *in camera* review of the agency records at issue. For the reasons that follow, Plaintiffs' motion to strike the classified declarations is denied, and their motion in the alternative for *in camera* review is granted in part and denied in part. However, the Court defers ruling on the motions for summary judgment pending submission of supplemental materials described below.

I.  BACKGROUND[1]

A.  The FAA

Congress enacted the Foreign Intelligence Surveillance Act of 1978 ("FISA") "to establish procedures under which federal officials could obtain authorization to conduct electronic surveillance for foreign intelligence purposes." *Amnesty Int'l USA v. Clapper*, 638 F.3d 118, 122 (2d Cir. 2011); *see* 50 U.S.C. §§ 1801(f), 1804(a)(6)(A). Notably, FISA created the Foreign Intelligence Surveillance Court ("FISC"), a body comprised of eleven federal judges and vested with jurisdiction to authorize electronic surveillance of a particular target "for the purpose of obtaining foreign intelligence information." 50 U.S.C. §§ 1802(b); *see United States v. Abu-Jihaad*, 630 F.3d 102, 117 (2d Cir. 2010).

In 2008, the FAA amended FISA, "leav[ing] much of the preexisting surveillance authorization procedure intact, but . . . creat[ing] new procedures for the authorization of foreign intelligence electronic surveillance targeting non-United States persons located outside the United States." *Clapper*, 638 F.3d at 122; *see* 50 U.S.C. § 1881a. In contrast to the FISA scheme, the FAA "does not require the government to submit an individualized application to the FISC identifying the particular targets or facilities to be monitored." *Clapper*, 638 F.3d at 124. Instead, Section 702 of the FAA permits the Attorney General and Director of National Intelligence to apply for surveillance authorization by submitting a written certification attesting, *inter alia*, that "a significant purpose of the acquisition is to obtain foreign intelligence information," 50 U.S.C. § 1881a(g)(2)(A)(v), that adequate targeting and minimization procedures have been approved or submitted for FISC approval, and that the surveillance complies with the relevant statutory restrictions. *Clapper*, 638 F.3d at 124. If the FISC authorizes the requested surveillance, the Attorney General and Director of National Intelligence "may authorize jointly, for a period of up to 1 year . . . , the targeting of persons reasonably believed to be located outside the United States to acquire foreign intelligence information." 50 U.S.C. § 1881a(a). The FAA is currently set to expire on December 31, 2012. *See* Pub. L. No. 110-261, § 403(b)(1), 122 Stat. 2436 (2008).

B.  The FOIA Request

By letter dated November 18, 2009, Plaintiffs submitted a FOIA request to the ODNI, NSA, DOD, and DOJ (including the National Security Division ("NSD") and the Federal Bureau of Investigation ("FBI")) (collectively, the "government"), seeking

---

[1] Unless otherwise noted, the following facts are derived from Plaintiffs' Rule 56.1 Statement. The government did not submit a Local Rule 56.1 statement, claiming that "the general rule in this Circuit is that in FOIA actions, agency affidavits alone will support a grant of summary judgment." *Ferguson v. F.B.I.*, No. 89 Civ. 5071 (RDP), 1995 WL 329307, at *2 (S.D.N.Y. June 1, 1995); *cf. NAACP Legal Def. & Educ. Fund, Inc. v. U.S. Dep't of Housing*, No. 07 Civ. 3378 (GEL), 2007 WL 4233008, at *1 n.1 (S.D.N.Y. Nov. 30, 2007). In resolving the instant motions, the Court has also considered the Complaint, Plaintiffs' Memorandum of Law in Support of the Motion for Summary Judgment ("Pls.' Mem."), Defendants' Memorandum of Law in Support of the Cross-Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment ("Defs.' Mem."), Plaintiffs' Reply Memorandum of Law in Support of the Motion for Summary Judgment and in Opposition to Defendants' Cross-Motion for Summary Judgment ("Reply"), as well as Plaintiffs' Memorandum of Law in Support of the Motion to Strike ("Pls.' Strike Mem."), Defendants' Memorandum of Law in Opposition to the Motion to Strike ("Defs.' Strike Opp'n"), Plaintiffs' Reply Memorandum of Law in Support of the Motion to Strike ("Strike Reply"), and the various exhibits and declarations attached thereto.

"any and all" records in seven document categories. (Compl. Ex. A.) Specifically, Plaintiffs requested records pertaining to (1) the number of FAA acquisition applications submitted to the FISC and the number of applications granted, granted with modification, or rejected; (2) the number of United States citizens or residents whose communications have been collected, intercepted, or otherwise targeted pursuant to Section 702; (3) the collection, analysis, or dissemination of purely domestic communications pursuant to Section 702; (4) legal memoranda, procedures, policies, or other guidelines related to Section 702 surveillance; (5) inter- or intra-agency correspondence related to the scope, interpretation, or rules governing Section 702 surveillance; (6) reports, assessments or reviews issued or conducted pursuant to Section 702; and (7) complaints, investigations, or disciplinary actions related to Section 702 surveillance. (*See* Pls.' 56.1 ¶ 8.) Plaintiffs also sought expedited processing of their FOIA request and waiver of the processing fees associated with disclosure. (*Id.* ¶ 10.) The ODNI, NSA, and DOD subsequently denied Plaintiffs' request for expedited processing, while the DOJ referred Plaintiffs' request to various divisions of the agency. (*Id.* ¶ 11.)

## C.  Procedural History

Plaintiffs commenced this action by filing a complaint on June 3, 2010, seeking to compel timely processing and prompt disclosure of all requested records. The parties entered a stipulation clarifying and limiting the scope of the FOIA request on August 13, 2010, and the government produced 422 pages of redacted documents on November 29, 2010. On April 25, 2011, the ODNI, NSA, NSD and FBI each provided declarations explaining their respective redactions and withholdings. Plaintiffs moved for summary judgment on

June 3, 2011, and Defendants cross-moved for summary judgment on July 1, 2011. In conjunction with their reply papers, Plaintiffs filed a motion to strike the classified declarations submitted by Defendants or, in the alternative, for *in camera* review. The motions were fully submitted as of August 17, 2011.

## II.  LEGAL STANDARD

The standard for summary judgment is well settled. Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the burden of proving that there is no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has met its burden, the nonmoving party "must come forward with specific facts showing that there is a genuine issue for trial." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (internal citations and quotation marks omitted).

In ruling on a motion for summary judgment, the court must resolve any ambiguity in favor of the nonmoving party. *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments . . . ." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). As a result, summary judgment will not issue where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at

248. However, "a complete failure of proof concerning an essential element of the nonmoving party's case" renders summary judgment proper. *Celotex*, 477 U.S. at 323. "Inferences and burdens of proof on cross-motions for summary judgment are the same as those for a unilateral summary judgment motion." *Ferrigno v. U.S. Dep't of Homeland Security*, No. 09 Civ. 5878 (RJS), 2011 WL 1345168, at *3 (S.D.N.Y. Mar. 29, 2011).

## III. DISCUSSION

"The Freedom of Information Act adopts as its most basic premise a policy strongly favoring public disclosure of information in the possession of federal agencies." *Halpern v. Fed. Bureau of Investigation*, 181 F.3d 279, 286 (2d Cir. 1999). Specifically, FOIA requires that "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules . . . shall make the records promptly available to any person." 5 U.S.C. § 552(a)(3)(A).

"Congress recognized, however, that public disclosure is not always in the public interest." *CIA v. Sims*, 471 U.S. 159, 166-67 (1985). Accordingly, FOIA also provides nine enumerated exemptions to the disclosure requirement, which represent "a balance struck by Congress between the public's right to know and the Government's legitimate interest in keeping certain information confidential." *ACLU v. Dep't of Def.*, 723 F. Supp. 2d 621, 626 (S.D.N.Y. 2010) (quoting *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 925 (D.C. Cir. 2003)). Although the FOIA exemptions are narrowly construed, they "are intended to have meaningful reach and application." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989). All doubts as to whether a FOIA exemption applies are

resolved in favor of disclosure. *See Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys.*, 601 F.3d 143, 147 (2d Cir. 2010).

Summary judgment pursuant to Rule 56 is "the preferred procedural vehicle for resolving FOIA disputes." *Adamowicz v. I.R.S.*, 552 F. Supp. 2d 355, 360 (S.D.N.Y. 2008). "In order to prevail on a motion for summary judgment in a FOIA case, the defending agency has the burden of showing that its search was adequate and that any withheld documents fall within an exemption to the FOIA." *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994). Summary judgment is proper where affidavits submitted by the defending agency "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record [or] by evidence of agency bad faith." *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 73 (2d Cir. 2009). Agency affidavits, known in FOIA litigation as *Vaughn* affidavits,[2] are "accorded a presumption of good faith." *Carney*, 19 F.3d at 812. However, "[t]he agency's decision that the information is exempt from disclosure receives no deference." *Bloomberg*, 601 F.3d at 147. Accordingly, it is the responsibility of the federal courts to conduct *de novo* review of an agency decision to withhold records requested pursuant to FOIA. *See A. Michael's Piano Inc. v. Fed. Trade Comm.*, 18 F.3d 138, 143 (2d Cir. 1994).

In this case, Defendants seek to justify their redactions and withholdings with

---

[2] In *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), the D.C. Circuit Court "conceived of the document now known as the *Vaughn* affidavit as a means of overcoming the institutional difficulties in FOIA litigation." *Halpern*, 181 F.3d at 290.

public declarations from the ODNI, NSD, NSA, and FBI, as well as two supplemental classified declarations submitted *ex parte* and *in camera*. At issue are three FOIA exemptions invoked by the various agencies: (1) the national security exemption, 5 U.S.C. § 552(b)(1) ("Exemption 1"); (2) the statutory exemption, 5 U.S.C. § 552(b)(3) ("Exemption 3"); and (3) the law enforcement techniques exemption, 5 U.S.C. § 552(b)(7)(E) ("Exemption 7(E)").[3] In what follows, the Court considers *de novo* the sufficiency of the agency declarations as a basis for the government's decision to withhold and redact the requested records pursuant to Exemptions 1, 3, and 7(E).

### A.  ODNI Declaration

The ODNI submitted an 11-page declaration by John F. Hackett, Director of Information Management for the ODNI ("Hackett Declaration"). (Decl. of Robert D. Balin, June 3, 2011, Ex. 4, Doc. No. 34.) The Hackett Declaration indicates that in response to Plaintiffs' FOIA request, the ODNI located 52 responsive documents comprising 499 pages. (*Id.* ¶ 18.) Of the 52 responsive documents, the ODNI referred 46 documents comprising 396 pages to other agencies for direct response to the FOIA request and released 6 documents comprising 103 pages in redacted form. (*Id.* ¶ 19.) Three of the released documents are semi-annual assessments conducted pursuant to Section 702, while the remaining three documents are ODNI cover letters transmitting the semi-annual assessments to Congress. (*Id.* ¶ 20.)

The Hackett Declaration devotes a single substantive paragraph to the redactions at issue,[4] explaining that "[t]he three semi-annual assessments were released with redactions made pursuant to FOIA Exemptions 1 and 3, which protect information that is currently and properly classified and information exempt from disclosure by statute." (*Id.* ¶ 23.) After asserting that the information at issue is "currently and properly classified pursuant to Executive Order 13526" and "protected by the sources and methods provision of the National Security Act, 50 U.S.C. § 403-1(i)," the Hackett Declaration simply avers that unspecified "[o]ther agencies will address the classified intelligence sources and method information contained in these documents in their respective declarations . . . ." (*Id.*)

#### 1.  Exemption 1

FOIA Exemption 1 permits an agency to withhold records that are: "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense . . . and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). As noted above, the Hackett Declaration invokes Executive Order 13,526, which permits classification of records relating to, *inter alia*, "intelligence activities (including covert action), intelligence sources or methods, or cryptology." Exec. Order No. 13,526 § 1.4(c) (Dec. 29, 2009). Under Executive Order 13,526, an agency may classify information when it "determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification

---

[3]   Plaintiffs do not contest agency withholdings pursuant to Exemptions 2, 4, 6, 7(C) or 7(D). (Pls.' Mem. 9 n.16).

[4]   Although the Hackett Declaration also addresses redactions to the ODNI cover letters pursuant to Exemptions 2 and 6 (Hackett Decl. ¶ 21), those withholdings are not contested (Pls.' Mem. 9 n.16).

authority is able to identify or describe the damages." *Id.* § 1.1(a)(4). Executive Order 13,526 further provides that "[i]n no case shall information be classified . . . in order to: (1) conceal violations of law, inefficiency, or administrative error; (2) prevent embarrassment to a person, organization, or agency; (3) restrain competition; or (4) prevent or delay the release of information that does not require protection in the interest of the national security." *Id.* § 1.7(a).

Because courts "lack the expertise necessary to second-guess . . . agency opinions in the typical national security FOIA case," *Am. Civil Liberties Union v. U.S. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011) (internal citations and quotation marks omitted), it is well established that courts must accord "substantial deference" to agency affidavits that implicate national security, *Associated Press v. U.S. Dep't of Def.*, 498 F. Supp. 2d 707, 710 (S.D.N.Y. 2007) (internal citations and quotation marks omitted). Nonetheless, "deference is not equivalent to acquiescence," *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998), and the Court must not "relinquish[]" its "independent responsibility" to review agency determinations *de novo*, *Goldberg v. U.S. Dep't of State*, 818 F.2d 71, 77 (D.C. Cir. 1987).

Upon careful review of the Hackett Declaration, the Court finds that the ODNI has failed to make the required showing that the information withheld "logically falls" within Exemption 1. *Wilner*, 592 F.3d at 73. The Hackett Declaration "gives no contextual description . . . of the specific redactions made to the various documents," *Halpern*, 181 F.3d at 293, and fails even to identify the provisions of Executive Order 13,526 that purportedly apply. Although the redacted semi-annual reports certainly

contain contextual clues, the very purpose of the *Vaughn* affidavit is to "enable[] the court to review the agency's claimed redactions without having to pull the contextual information out of the redacted documents for itself." *Id.* at 294. Assessed in terms of "reasonable specificity," the Hackett Declaration is clearly insufficient to justify the ODNI withholdings under Exemption 1.

## 2. Exemption 3

The ODNI also appeals to FOIA Exemption 3, which applies to records "specifically exempted from disclosure by statute." 5 U.S.C. § 552(b)(3). The two threshold criteria for an Exemption 3 withholding are that: "(1) the statute invoked qualifies as an [E]xemption 3 withholding statute, and (2) the materials withheld fall within that statute's scope." *A. Michael's Piano*, 18 F.3d at 143 (citing *CIA v. Sims*, 471 U.S. 159, 167 (1985)). Here, the Hackett Declaration relies on the "sources and methods" provision of the National Security Act of 1947, as amended (the "National Security Act"), which states that "[t]he Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 403-1(i)(1).[5] Plaintiffs do not dispute that Section 403-1(i) of the National Security Act constitutes an exemption statute. *See Larson v. Dep't of State*, 565 F.3d 857, 865 (D.C. Cir. 2009). Rather, the parties contest the second prong of the Exemption 3 analysis – that is, whether the material withheld relates to "intelligence sources and

---

[5] The Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, 118 Stat. 3638 (codified at 50 U.S.C. § 403-1(i)(1)), amended the National Security Act. *See Am. Civil Liberties Union v. Dep't of Def.*, 389 F. Supp. 2d 547, 559 n.8 (S.D.N.Y. 2005). Accordingly, the Janosek Declaration refers to the same provision as Section 102(A)(i)(l) of the Intelligence Reform and Terrorism Prevention Act of 2004. *See infra* Part III.C.2.

methods" within the meaning of the National Security Act.

With respect to Exemption 3, the Hackett Declaration offers a single sentence, which asserts that "[t]he information in these documents . . . is protected by the sources and methods provision of the National Security Act," and recites the language of the statute. (Hackett Decl. ¶ 23.) But "conclusory affidavits that merely recite statutory standards, or are overly vague or sweeping will not . . . carry the government's burden." *Larson*, 565 F.3d at 864. The affidavit here is no exception. Mere invocation of the exemption statute, coupled with "b3" labels throughout the redacted documents, is simply not enough. Accordingly, the Court also finds the Hackett Declaration insufficient to justify the ODNI withholdings under Exemption 3.

## B.  NSD Declaration

The NSD submitted a nine-page declaration by Mark A. Bradley, Director of the FOIA and Declassification Unit of the Office of Law and Policy in the NSD ("Bradley Declaration"). (Decl. of Robert D. Balin, June 3, 2011, Ex. 5, Doc. No. 34.) The Bradley Declaration indicates that in response to Plaintiffs' FOIA request, the NSD located five categories of records comprising more than 500 pages, but withheld them all pursuant to Exemption 1. (*Id.* ¶ 5.)  The Bradley Declaration also states that the FBI forwarded an unspecified number of documents to the NSD, and that "portions of those documents were withheld" under Executive Order 13,526. (*Id.* ¶ 8.)

According to the Bradley Declaration, the responsive NSD records fall into the following categories: (1) notices and reports to the FISC; (2) Attorney General guidelines; (3) correspondence;

(4) implementation procedures; and (5) semi-annual reports and supporting documentation. (*Id.* ¶ 5.) The Bradley Declaration allots two paragraphs of explanation to each record category. The first paragraph in each pair avers that the information at issue "is currently and properly classified under Executive Order 13526" because it "meets the criteria for classification as set forth in subparagraphs (c) and (g) of Section 1.4 of Executive Order 13526." (*Id.* ¶¶ 10, 12, 14, 16, 18.) The other paragraph in each pair offers variations on the claim that disclosure would cause damage to national security by revealing "the manner and means by which the Government targets non-United States persons" (*id.* ¶¶ 11, 13, 17, 19), or by "provid[ing] our adversaries and foreign intelligence targets with insight into the Government's foreign intelligence collection capabilities" (*id.* ¶¶ 11, 13, 15, 17, 19).

Once again, the Court finds that the summary assertions afforded by the Bradley Declaration fail to "describe the justifications for nondisclosure" under Exemption 1 with "reasonabl[e] specific[ity]." *Wilner*, 592 F.3d at 73 (internal citations and quotation marks omitted). The NSD does cite subparagraphs (c) and (g) of Section 1.4 of Executive Order 13,526, which authorize the classification of information concerning "intelligence activities (including covert action), intelligence sources or methods, or cryptology," and "vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or protection services relating to the national security." (Bradley Decl. ¶¶ 10, 12, 14, 16, 18 (citing Exec. Order No. 13,526 §§ 1.4(c), (g) (Dec. 29, 2010).) But the surrounding explanations "read more like a policy justification" for Section 1.4 of Executive Order 13,526, "while barely pretending to apply the terms of that section to the specific

facts of the documents at hand."[6] *Halpern*, 181 F.3d at 293. By proffering conclusory and nearly identical justifications for the various NSD withholdings, the government appears to assume that *de novo* FOIA review requires little more than a judicial spell check. Because "blind deference is precisely what Congress rejected when it amended FOIA in 1974," *id.*, the Court finds the Bradley Declaration insufficient to justify the NSD withholdings under Exemption 1.

## C. NSA Declaration

The NSA submitted a 15-page public declaration by Diane M. Janosek, Deputy Associate Director for Policy and Records for the NSA ("Janosek Declaration"). (Decl. of Robert D. Balin, June 3, 2011, Ex. 7, Doc. No. 34.) The Janosek Declaration indicates that in response to Plaintiffs' FOIA request, the NSA located 27 responsive documents comprising 144 pages. (*Id.* ¶ 12.) Following a "line-by-line review" of the responsive information, the NSA withheld in full 12 documents comprising 70 pages and released 15 documents comprising 74 pages in redacted form. (*Id.*) The Janosek Declaration cites Exemptions 1 and 3 as the basis for the NSA withholdings. (*Id.* ¶ 3.) The ODNI and NSD separately referred an unspecified number of documents for NSA consultation and review. (*Id.* ¶¶ 16-17.) With the exception of the redacted semi-annual reports, the referred documents were also withheld pursuant to Exemptions 1 and 3. (*Id.*)

### 1. Exemption 1

With respect to Exemption 1, the Janosek Declaration invokes Executive Order 13,526 as the basis for the requested records "to be kept secret in the interest of national defense." *See* 5 U.S.C. § 552(b)(1). Specifically, the Janosek Declaration avers that the classified information at issue includes "foreign government information" pursuant to Section 1.4(b), "intelligence activities (including covert action), intelligence sources and methods, or cryptology" pursuant to Section 1.4(c), and "vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or protection services relating to the national security" pursuant to Section 1.4(g). (*Id.* ¶ 21.) In what follows, the Janosek Declaration explains that Plaintiffs' FOIA request "seeks specific information about operational details of NSA's collection under the FAA," and that such disclosure "would reveal information about NSA's success or lack of success in its collection efforts" and about "the U.S. Intelligence Community's capabilities, priorities, and activities." (*Id.* ¶ 23.) The Janosek Declaration further asserts that disclosure of the requested information would provide adversaries of the United States with information about "the nature and frequency of the Government's use of specific techniques," thereby enabling them to undermine the national security mission of the NSA. (*Id.*)

With respect to the statistical portions of the instant FOIA request, the Janosek Declaration clearly falls short of the mark. As modified by the August 13, 2010 stipulation, Plaintiffs' FOIA request seeks "documents stating numbers of [S]ection 702 applications and orders" generally, as

---

[6] Moreover, the "Deleted Page Information Sheets" that accompany the Bradley Declaration appear to invoke Exemptions 3 and 7(E), in addition to Exemption 1, as the basis for deletions to records referred by the FBI. But the Bradley Declaration itself makes no mention of Exemptions 3 and 7(E) (*see* Bradley Decl. ¶¶ 8-9), and the government insists that the "NSD relied on Exemption 1 for information it withheld" in the FBI records (Defs.' Mem. 10-11 n.6).

well as documents stating numbers of Section 702 applications and orders pertaining to United States persons. (Defs.' Mem., Addendum i.)  Plaintiffs' reply papers assert that these statistics on FAA overcollection "are central to the FOIA request and thus this case." (*See, e.g.*, Reply 2.)

Rather than calibrate its response to meet its obligation to "identify or describe" the national security damage that could result from producing the information identified in Plaintiffs' *specific* requests, Exec. Order No. 13,526 § 1.1(a)(4), the NSA relies on a blanket assertion that the instant FOIA request impermissibly "seeks . . . operational details" about FAA collection (Janosek Decl. ¶ 23).  While it is possible that disclosure of the "frequency of the Government's use of specific techniques" could, under certain circumstances, implicate national security concerns (*id.*), a substantial portion of Plaintiffs' requests target information regarding alleged *misuse* and abuse of the FAA, such as the numbers of U.S. persons who have been targeted (*see* Pls.' Mem. 1; Def.'s Mem., Addendum i).  The Janosek Declaration does not "identify or describe" the risks to national security that would accompany disclosure of such information.  Exec. Order No. 13,526 § 1.1(a)(4).  Because the NSA fails to demonstrate that the withheld statistical information "logically falls within the claimed exemption," *Wilner*, 592 F.3d at 73, the Court finds the Janosek Declaration insufficient to justify the statistical withholdings under Exemption 1.

With respect to certain non-statistical portions of the instant FOIA request, the Janosek Declaration supplies more plausible justifications.  For example, Plaintiffs' modified FOIA request seeks legal memoranda, procedures, policies, directives, practices, or guidelines pertaining to Section

702 surveillance, as well as inter- and intra-agency correspondence pertaining to the scope of authority granted by Section 702. (Defs.' Mem., Addendum i-ii.)  Although the Janosek Declaration does not address the security risks posed by particular types of documents, the assertion that disclosure of legal memoranda and agency correspondence "would reveal information about the U.S. Intelligence Community's capabilities, priorities, and activities" (Janosek Decl. ¶ 23) is certainly plausible. But plausibility is not "reasonable specificity," and the Janosek Declaration still fails to supply anything more than "vague and conclusory" assertions that "read much like bureaucratic double-talk." *Halpern*, 181 F.3d at 293.  Accordingly, the Court also finds the Janosek Declaration insufficient to justify the remaining NSA withholdings under Exemption 1.

### 2.  Exemption 3

With respect to Exemption 3, the Janosek Declaration relies on three separate statutes that allegedly preclude disclosure of the information at issue.  First, the NSA asserts that the requested documents are exempt under section 6 of the National Security Agency Act of 1959, which provides that "[n]othing in this Act or any other law . . . shall be construed to require the disclosure of the organization or any function of the National Security Agency, [or] of any information with respect to the activities thereof . . . ."  Pub. Law No. 86-36, 50 U.S.C. § 402 note.  Second, the NSA cites 18 U.S.C. § 798, which criminalizes the unauthorized disclosure of classified information concerning, *inter alia*, "the communications intelligence activities of the United States or any foreign government." 18 U.S.C. § 798.  Finally, the NSA refers to section 102A(i)(l) of the Intelligence Reform and Terrorism Prevention Act of 2004, which states that "[t]he Director of

National Intelligence shall protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 403-1(i)(l).

As a general matter, "Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage." *Wilner*, 592 F.3d at 72. The Janosek Declaration asserts, and Plaintiffs do not dispute, that all three statutes qualify as exemption statutes under Exemption 3. Thus, the relevant question is whether the information withheld by the NSA falls within the scope of the relevant exemption statutes.

In this case, the Janosek Declaration devotes only a portion of a sentence to its Exemption 3 justification, concluding that "I have determined that the NSA's SIGINT activities and functions, and its intelligence sources and methods would be revealed if any of the withheld information about NSA's collection under the FAA are disclosed." (Janosek Decl. ¶ 30.) In their opposition papers, Defendants contend that their minimalist approach is permissible because section 6 of the National Security Act "'eases th[e] burden for the agency, as it exempts from disclosure *any* information with respect to the activities of' the NSA." (Defs.' Mem. 18 (quoting *Wilner*, 592 F.3d at 75).) To that end, Defendants lean heavily on the discussion of section 6 in *Wilner v. NSA*, 592 F.3d 60, 75 (2d Cir. 2009), in which the Second Circuit approved the use of a *Glomar* response, which permits the NSA to neither confirm nor deny the

existence of responsive records.[7] Specifically, the Circuit held that "[e]ven if the NSA affidavits, standing alone, are insufficient, as plaintiffs argue, the very nature of their request . . . establishes that *any response* would reveal 'information with respect to the activities' of the NSA." *Id.* Citing *Wilner*, Defendants urge the same result here. (Defs.' Mem. 18-19.)

What Defendants neglect to consider is the contrasting "nature of the[] request" at issue here. *Wilner*, 592 F.3d at 75. In *Wilner*, the plaintiffs were attorneys representing individuals detained at Guantánamo Bay, Cuba, and their FOIA request sought records showing whether the government had intercepted their communications related to representation of their detainee clients. *Id.* at 64. Thus, the "very nature" of the FOIA request in *Wilner* sought records "concerning whether [plaintiffs'] communications were monitored by the NSA." *Id.* at 75. The logic of *Wilner* readily bars Plaintiffs' requests for legal memoranda and agency correspondence, since the nature of those requests clearly implicates NSA "activities" within the meaning of section 6 of the National Security Act. Pub. Law No. 86-36, 50 U.S.C. § 402 note. But in contrast to *Wilner*, Plaintiffs here specifically disclaim any request for the content of FAA surveillance applications or the identities of FAA surveillance targets. (Pls.' Mem. 6.) As previously noted, the primary focus of Plaintiffs' FOIA request appears to be statistics with respect to FAA overcollection – in other words, statistics that would reflect the exercise of FAA authority beyond the bounds of the authorizing statute. (*See id.*)

---

[7]   The so-called *Glomar* doctrine "originated in a FOIA case concerning records pertaining to the Hughes Glomar Explorer, an oceanic research vessel." *Wilner*, 592 F.3d at 67 (citing *Phillippi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976)).

Based on the public Janosek Declaration, the Court cannot say that the "very nature" of Plaintiffs' statistical requests concerns the "activities" of the NSA within the meaning of section 6 of the National Security Act. The single conclusory sentence that seeks to justify the NSA withholdings is similarly insufficient with respect to the remaining exemption statutes, 18 U.S.C. § 798 and 50 U.S.C. § 403-1(i)(l). (Janosek Decl. ¶ 30.) On these facts, to credit a *pro forma* recitation of the exemption statutes as the basis for the NSA withholdings would be to "relinquish[]" the Court's "independent responsibility" to review agency determinations *de novo. Goldberg v. U.S. Dep't of State*, 818 F.2d 71, 77 (D.C. Cir. 1987). Accordingly, the Court finds the Janosek Declaration insufficient to justify the NSA withholdings under Exemption 3.

## D.  FBI Declaration

The FBI submitted a 46-page declaration by David M. Hardy, Section Chief of the Records/Information Dissemination Section ("RIDS") in the Records Management Division of the FBI ("Hardy Declaration"). (Decl. of Robert D. Balin, June 3, 2011, Ex. 13, Doc. No. 34.) The Hardy Declaration indicates that, because the FBI was not among the addressees to the original FOIA request, the FBI first officially became aware of Plaintiffs' FOIA request on June 9, 2010, when a copy of the Complaint was forwarded by the United States Attorney's Office for the Southern District of New York. (*Id.* ¶ 8.) The FBI subsequently reviewed 748 pages of responsive documents and released 239 pages in whole or in part, asserting Exemptions 1, 2, 3, 4, 5, 6, 7(C), 7(D), and 7(E). (*Id.* ¶ 11.) The FBI also withheld in full 509 pages. (*Id.*) The released pages were Bates-stamped and coded by exemption "categories" defined in the Hardy Declaration. (*Id.* ¶¶ 30, 32.) Deleted Page Information Sheets noting the

cited Exemptions were also released as a substitute for pages withheld in full. (*Id.* ¶ 30.)

The bulk of the Hardy Declaration reads like a primer in records management, expounding at length on how FOIA requests wend through the RIDS organizational chart. In what follows, the Court reserves its focus to the few short paragraphs that address the exemptions at issue here.

### 1.  Exemption 1

As with the foregoing agency affidavits, the Hardy Declaration cites Executive Order 13,526 as the basis for the FBI withholdings under Exemption 1. (*Id.* ¶¶ 34-35.) The Hardy Declaration avers that the withheld information pertains to "procedures for targeting certain persons outside the United States . . . , acquisition training, retention, analyzation, and dissemination" (*id.* ¶ 39), as well as "actual intelligence activities and methods used by the FBI" and "intelligence gathering capabilities" (*id.* ¶ 40). According to the Hardy Declaration, such disclosure could be expected to cause national security damage by "allow[ing] hostile entities to discover the current methods and activities used," and revealing both the "current specific targets of the FBI's national security investigations" and the "criteria used and priorities assigned to current intelligence or counterintelligence investigations." (*Id.* ¶ 41.) The Hardy Declaration separately avers that specific FBI case file numbers were withheld because they contain "a geographical prefix or the originating office and case number" (*id.* ¶ 43), which could allow a hostile analyst to create a "partial mosaic" of the specific intelligence activity, "leading to the exposure of actual current activities or methods" (*id.* ¶ 44).

To the extent that the case file numbers fall within the scope of the operative FOIA

request, the Court finds that the Hardy Declaration provides a "reasonably specific" description of the justifications for nondisclosure. *Wilner*, 592 F.3d at 73. It is well established that "[m]inor details of intelligence information may reveal more information than their apparent insignificance suggests because, much like a piece of jigsaw puzzle, [each detail] may aid in piecing together other bits of information . . . ." *Larson*, 565 F.3d at 864 (alteration in original) (internal citations and quotation marks omitted). In this case, the Hardy Declaration explains that disclosure of an intelligence file number could enable a hostile analyst "to patch bits and pieces of information together until the actual use of the application of the source or method can be determined." (Hardy Decl. ¶ 44.) Because the Hardy Declaration demonstrates that the case file numbers "logically fall[] within the claimed exemption," *Wilner*, 592 F.3d at 73, the Court finds that the FBI has carried its burden with respect to the file number withholdings.[8]

With respect to the balance of the Exemption 1 withholdings, however, the Hardy Declaration makes little effort to describe the documents at issue or explain why they reflect intelligence "methods," "activities," or "capabilities." (Hardy Decl. ¶ 40.) The Exemption notations on the redacted documents and the Deleted Page Information Sheets are similarly insufficient, with neither "provid[ing] the kind of fact-specific justification that either (a) would permit appellant to contest the affidavit in adversarial fashion, or (b) would permit a reviewing court to engage in effective *de novo* review of the FBI's redactions." *Halpern*, 181 F.3d at 293. Because the

Hardy Declaration fails to fulfill the "functional purpose" of the *Vaughn* affidavit, *id.*, the Court finds that the FBI has not carried its burden with respect to the remaining Exemption 1 withholdings.

### 2. Exemption 7(E)

The other relevant Exemption proffered by the Hardy Declaration is Exemption 7(E), which protects "records or information compiled for law enforcement purposes," that, if made public, "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if [that] could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). With respect to Exemption 7(E), the Hardy Declaration *does* identify the records redacted or withheld as internal e-mails, training slides, legal opinions and interpretations of techniques, Standard Operating Procedures, electronic communications concerning investigations, case write-ups, and miscellaneous reports. (Hardy Decl. ¶ 69.) But in explaining the FBI's reasons for invoking Exemption 7(E), the Hardy Declaration offers little more than a generic assertion that disclosure "could enable targets . . . to avoid detection or develop countermeasures to circumvent" law enforcement efforts. (*Id.*) The Court regards such boilerplate as insufficient to carry the FBI's burden with respect to the Exemption 7(E) withholdings.

### E.  Classified Declarations

Finally, the Court is also in receipt of two classified declarations, one from Diane Janosek of the NSA and one from an undisclosed declarant.

---

[8]  Significantly, Plaintiffs concede that the case file numbers are beyond the scope of the FOIA request as narrowed by the Stipulation and make no objection to their nondisclosure. (Pls.' Mem. 16 n.27.)

1.  Motion to Strike

As previously noted, Plaintiffs have moved to strike the classified declarations. (*See* Pls.' Strike Mem. 1.)  In a FOIA action implicating national security interests, the Court may conduct *in camera* review of agency affidavits after "attempt[ing] to create as complete a public record as is possible." *Phillippi v. C.I.A.*, 546 F.2d 1009, 1013 (D.C. Cir. 1976).  Although *in camera* review of agency affidavits "differs significantly from *in camera* review of the actual requested documents," *John Doe Corp. v. John Doe Agency*, 850 F.2d 105, 110 (2d Cir. 1988), when national security is at issue, "*in camera* review of affidavits, followed if necessary by further judicial inquiry, will be the norm," *Stillman v. CIA*, 319 F.3d 546, 548 (D.C. Cir. 2003) (internal quotation marks omitted).  Nonetheless, "[a] court should only consider information *ex parte* and *in camera* that the agency is unable to make public if questions remain after the relevant issues have been identified by the agency's public affidavits and have been tested by plaintiffs." *Wilner*, 592 F.3d at 75-76.

In this case, the Court first considered the four public agency affidavits and attempted "to create as complete a public record as is possible," *Phillippi*, 546 F.2d at 1013, by making "itemized findings" with respect to each affidavit, *Halpern*, 181 F.3d at 295.  Finding the public affidavits insufficient, the Court deems it necessary to examine the classified declarations as well. *See Amnesty Int'l USA v. C.I.A.*, 728 F. Supp. 2d 479, 507-08 (S.D.N.Y. 2010) (adopting a similar procedure). Accordingly, Plaintiffs' motion to strike the classified declarations is denied.[9]

2.  Sufficiency of the Classified Declarations

At the close of summary judgment briefing, the Court was in receipt of four public agency affidavits and two wholly classified agency affidavits.  In opposing Plaintiffs' motion to strike, however, the government released a redacted version of the classified Janosek Declaration.  (*Ex Parte* Declaration of Diane M. Janosek, June 30, 2011, Doc. No. 43 ("*Ex Parte* Janosek Declaration").)  Accordingly, the Court is now in receipt of a sealed, unredacted version of the classified Janosek Declaration and a second, wholly classified declaration.

Upon careful review of the foregoing submissions, the Court finds the classified declarations considerably more forthcoming, but ultimately insufficient to justify the relevant withholdings.  Although the classified status of the documents precludes an itemized analysis here, the Court notes that the classified declarations share the deficiencies of the public declarations with respect to Plaintiffs' requests for statistical data.  For example, an unredacted paragraph of the classified Janosek Declaration avers that "[d]isclosure of statistical information would reveal the scope of NSA's collection activities under the FAA," and that such disclosure "could reasonably be expected to cause exceptionally grave damage to the national security" pursuant to Exemption 1. (*Id.* ¶ 17.)  But it is far from clear to the Court why disclosure of the *number* of

---

Strike Mem. 1.)  "*In camera* review is considered the exception, not the rule, and the propriety of such review is a matter entrusted to the district court's discretion." *Local 3, Int'l Bhd. Of Elec. Workers, AFL-CIO v. NLRB*, 845 F.2d 1177, 1180 (2d Cir. 1988).  In light of the supplemental *Vaughn* submissions mandated below, the Court declines to conduct a comprehensive *in camera* review of the contested agency records at this stage of the litigation.

---

[9]  Plaintiffs move in the alternative for *in camera* review of the underlying agency records.  (*See* Pls.'

United States citizens or residents subject to FAA surveillance logically reveals the scope of NSA activity. As noted above, agencies may not classify information simply to "conceal violations of law, inefficiency, or administrative error," or to "prevent embarrassment" to the agency. Exec. Order No. 13,526 § 1.7(a). Without an actual explanation as to why disclosure "would reveal the scope of NSA's collection activities," the Court simply cannot engage in a meaningful *de novo* review as is required by law.

### F.   Additional Submissions

As an alternative to their motion to strike, Plaintiffs have requested full *in camera* review of the agency records withheld by Defendants. (*See* Pls.' Strike Mem. 1-2.) When faced with conclusory or otherwise insufficient agency affidavits, "the district court will have a number of options for eliciting further detail from the government." *Halpern*, 181 F.3d at 295. For example, the district court "may require supplemental *Vaughn* affidavits or may permit appellant further discovery." *Id.* In the alternative, the district court "may offer the government the option of submitting additional *Vaughn* affidavits for *in camera* review, particularly if the government holds fast to its view that revealing any greater specificity in open court could compromise national security." *Id.*

In this case, the Court is persuaded that limited *in camera* review is both necessary and appropriate in order to satisfy the Court's "independent responsibility" to conduct *de novo* review. *Goldberg*, 818 F.2d at 77. However, the comprehensive review requested by Plaintiffs far exceeds what is required to fulfill this obligation. Accordingly, IT IS HEREBY ORDERED THAT, no later than December 23, 2011, the government shall submit for *in camera*

review *Vaughn* indices and, if necessary, supplementary *Vaughn* affidavits that include "a relatively detailed analysis [of the withheld material] in manageable segments" without resort to "conclusory and generalized allegations of exemptions." *Vaughn*, 484 F.2d at 826. Ideally, the submissions should also provide "an indexing system [that] would subdivide the [withheld] document under consideration into manageable parts cross-referenced to the relevant portion of the [g]overnment's justification." *Id.* at 827. Although the Second Circuit has "eschewed rigid adherence to any particular indexing format under the *Vaughn* standard," *Halpern*, 181 F.3d at 291, the government may wish to identify the Bates numbers of the responsive documents, the applicable document category from Plaintiffs' FOIA request, as well as a specific explanation for why the document or documents at issue (including the requested statistical data) "logically falls within the claimed exemption," *Wilner*, 592 F.3d at 73.

Obviously, the goal of the supplemental submissions is "to obtain a sufficient degree of detail so as to fulfill the purposes of the *Vaughn* affidavit," *Halpern*, 181 F.3d at 295, by "forc[ing] the government to analyze carefully any material withheld" and "enabl[ing] the trial court to fulfill its duty of ruling on the applicability of the exemption," *Keys v. U.S. Dep't of Justice*, 830 F.2d 337, 349 (D.C. Cir. 1987). Mindful that "it is bad law and bad policy to second-guess the predictive judgments made by the government's intelligence agencies," *Wilner*, 592 F.3d at 76 (internal quotation marks omitted), the Court requires the foregoing submissions only to fulfill its duty to conduct meaningful and effective *de novo* review.

IV. CONCLUSION

For the reasons stated above, Plaintiffs' motion to strike is HEREBY DENIED; their motion in the alternative for *in camera* review is GRANTED IN PART and DENIED IN PART. The Clerk of the Court is respectfully directed to terminate the motion located at Doc. No. 38. The cross-motions for summary judgment, located at Doc. Nos. 31 and 35, will remain open pending the additional submissions set forth above.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: November 15, 2011
        New York, New York

***

Plaintiffs are represented by Melissa Goodman and Alexander Abraham Abdo of the American Civil Liberties Union, 125 Broad Street, 18th Floor, New York, New York 10004; Bruce Johnson and Jennifer Arterburn of Davis Wright Tremaine LLP, 1201 Third Avenue, Suite 2200, Seattle, Washington 98101; Robert D. Balin and Samuel Bayard of Davis Wright Tremaine LLP, 1633 Broadway, New York, New York 10019; and Ronald Gary London of Davis Wright Tremaine LLP, 1919 Pennsylvania Avenue NW, Washington, DC 20006-3402. Defendants are represented by Benjamin H. Torrance, Carolina A. Fornos, and Louis Anthony Pellegrino of the United States Attorney's Office, Southern District of New York, 86 Chambers Street, New York, New York 10007.

15